# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

|  |  |
|---|---|
| JAMES G. KENNAWAY,<br><br>            Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br><br>            Defendant. | No. C05-4119-PAZ<br><br>**MEMORANDUM OPINION AND<br>ORDER** |

---

## I.  INTRODUCTION

The plaintiff James G. Kennaway ("Kennaway") seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI Supplemental Security Income ("SSI") benefits. Kennaway claims the ALJ erred in finding he retains the residual functional capacity to work, discounting functional limitations found by a doctor and a physical therapist. (*See* Doc. No. 9)

## II.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  Procedural Background

On December 4, 2002, Kennaway protectively filed applications for SSI and DI benefits, alleging a disability onset date of September 27, 2002. (R. 118-20, 399-402; *see* R. 17) Kennaway claims he is disabled due to a back injury and surgery for a herniated disk in September 2002, and Charcot-Marie Tooth Disease.[1] (R. 128) He claims he is

---

[1] Charcot-Marie Tooth Disease is an inherited neurological disorder that affects the normal function of the peripheral nerves. Typical features of the disease include weakness of the lower leg and foot muscles

(continued...)

unable to work due to severe pain in his back, hip, and leg; a painful deformity of his left foot; and an inability to remain in any position for more than thirty minutes at a time. (*Id.*) Kennaway's applications were denied initially and on reconsideration. (R. 93-97, 101-05, 403-10)

Kennaway requested a hearing (R. 106-105), and a hearing was held before ALJ Robert Maxwell on January 14, 2005. (R. 39-92) Kennaway was represented at the hearing by attorney David Scott. Kennaway testified at the hearing, and Vocational Expert ("VE") William Tucker also testified.

On March 14, 2005, the ALJ ruled Kennaway was not entitled to benefits. (R. 14-26) Kennaway appealed the ALJ's ruling, and on August 1, 2005, the Appeals Council denied Kennaway's request for review (R. 8-11), making the ALJ's decision the final decision of the Commissioner.

Kennaway filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) On October 24, 2005, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. (Doc. No. 4) Kennaway filed a brief supporting his claim on December 28, 2005. (Doc. No. 9) The Commissioner filed a responsive brief on February 21, 2006. (Doc. No. 10) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Kennaway's claim for benefits.

---

[1](...continued)
resulting in foot drop, frequent trips or falls, and foot deformities, such as fallen arches; weakness and muscle atrophy in the hands; and pain. *See* www.ninds.nih.gov (Apr. 29. 2006), website of the National Institute of Neurological Disorders and Stroke.

## B. Factual Background

### 1. Kennaway's hearing testimony

Kennaway was born in 1972, making him thirty-two years old at the time of the hearing. He lives in Spencer, Iowa, with his girlfriend and the couple's two daughters, ages six and one-and-a-half at the time of the hearing. Kennaway did not finish high school, but he obtained a GED in 1990.

Kennaway's work history includes work as a chicken sexer at a hatchery; poultry transporter and vaccinator; metal salvager; laborer at a fishery; machinist; painter; and carpenter. His longest job lasted about a year-and-a-half.

Kennaway hurt his back during Labor Day weekend of 2002, when he was "knee boarding" or "wake boarding" behind a boat. He did not feel pain or realize he was injured while he was out on the water, but when he woke up the next morning, he felt something like "a volt of electricity in the middle of [his] back." He went to see his family physician, who referred him to Michael R. Puumala, M.D., a neurosurgeon.

Dr. Puumala determined Kennaway had an extruded disc and he recommended surgery, which was performed on September 27, 2002. At about the same time, Kennaway was diagnosed with Charcot-Marie Tooth Disease ("CMT"). He had been having problems with his feet that eventually led to the diagnosis.

At the time of his back injury, Kennaway was working at Hy-Line International, a chicken hatchery in Spencer, Iowa. Kennaway worked determining the sex of baby chicks. He began working at Hy-Line in the fall of 2001. He went on medical leave on September 6, 2002, after his accident; had back surgery on September 27, 2002; and then returned to work for two to three hours per day beginning November 6, 2002. He felt unable to tolerate the standing required on the job due to the pressure on his back and feet. According to Kennaway, he was forced to hold himself up solely with his right side because his left foot would give way and he could not put weight on his left foot at all.

By December 2002, he was working every other day, for four to six hours per day, which was all he could tolerate due to the pain in his back and feet. Dr. Puumala prescribed physical therapy, and directed Kennaway to follow up with Marvin Hurd, M.D., who was treating Kennaway for his CMT.

Kennaway's family doctor suggested he seek evaluation and treatment at the University of Iowa Hospitals and Clinics. Kennaway was seen there in March 2003. At that time, he was having problems with ongoing contractions or "squeezing" in his feet causing a deformity of his feet, markedly worse on the left. The deformities affected his ability to walk properly. According to Kennaway, CMT caused his arches to pull up tightly and not to relax. He also developed symptoms in his hands, which are weakening and deteriorating due to the disease. When he comes in from very cold weather, he has trouble warming his hands and feet. The cold causes him to move slowly and affects his joints. His hands are clenched all the time.

Kennaway underwent surgery on his left foot in June 2003. He described the procedure as "moving the bone and releasing of the Achilles tendon . . . basically to get the foot to step 100 percent flat and not like the contraction of it would like hold my feet to the side to where they would hit at an angle around the edges instead of the heel to the front of the foot – how a normal foot is." After surgery, he had a cast on his left foot up to his knee. He remained in the cast for eight to ten weeks and used crutches to get around. However, with his back weakness and his other foot affected by the CMT, he had difficulty getting around.

After the hard cast was removed, he was placed in a walking boot or "air cast." He frequently stubbed his foot and continued to have difficulty getting around. At the end of the summer of 2003, he suffered a "busted fusion" of his second toe on the left foot, which he stated "basically ran the tip of the toe straight down to the floor instead of straight away from [him]." Thus, although his foot was flat, his great toe pointed

downward at an angle because a screw placed in his toe had been bent downward. Doctors gave him the option of undergoing another surgery immediately, or having the screw manually bent back into place. They tried the bending procedure but according to Kennaway, instead of bending the screw, it turned. His bones were soft from the surgical procedure, and with the screw out of place, he did not heal properly. He eventually underwent a second surgery on his left foot in October 2004. He was in a cast for another eight weeks following the second surgery, until mid-December 2004. Once the cast was removed, he was given physical therapy exercises and stretches to do at home. He still is not able to put his full weight on his left foot.

Kennaway's doctors have recommended he also have surgery to correct his right foot; however, until he is able to put full weight on his left foot, he is reluctant to go forward with the surgery. He complains of weakness in his lower back in addition to his CMT symptoms, and he fears if he has post-surgical problems with his right foot, he may be unable to walk or get around. He also stated his left foot may require additional surgery to correct deformities of the outer three toes that were not worked on during the first surgery.

Kennaway estimated he can sit for up to thirty minutes at a time before he would have to change position. He has been limited in the amount of time he can sit ever since his back surgery. He can be on his feet for a total of two or three hours in an eight-hour day, but then he would have to lie down. He can walk around a block if he takes his time, but it exhausts him, and then he cannot be on his feet for the rest of the day. He has been unable to jog or run since his back surgery.

Kennaway takes a muscle relaxer and pain medication. He stated the pills do not relieve his pain, but they "take the edge off."

Kennaway stated his hands are "fisted or just squeezing or clenched, basically, all the time." However, no doctor has placed a restriction on his activities with his hands.

His feet similarly are clenched up or contracted unless he is standing on them. According to him, there is no treatment for his CMT other than exercises and surgeries to release the tendons and correct the deformities. He currently is able to walk independently, without the use of crutches or a walking boot, but he uses a cane or holds onto to a railing or wall when he moves from place to place. If he stands and walks for a couple of hours, he will become weak and suffer frequent stumbles and falls.

Kennaway still sees a doctor with regard to his back. According to Kennaway, the disc that was operated on previously has re-herniated and has a buildup of scar tissue around it. However, again according to Kennaway, his doctors have stated there is no further medical treatment they can offer him. He stated doctors have recommended pain management, and exercise to rebuild the strength and mobility of his back. He exercises at home as much as he can, but if he over-exerts himself, he cannot get out of bed the next day. His doctors have restricted his lifting to twenty or thirty pounds, but he knows of no other functional limitations that a doctor has imposed on him.

Kennaway does not believe he could perform a job that required him to sit for six hours out of eight, or stand for six hours out of eight, or even one that allowed him to switch between sitting and standing. He opined he could work about four hours a day. He stated he has not been able to "comply 100 percent" with the requirements of full-time work ever since his back surgery. He has not had any employment since he attempted to return to work at Hy-Line following his surgery.

Kennaway receives $875 per month from his long-term disability insurance at Hy-Line, and those payments likely would cease should he return to work. Kennaway stated the disability insurance company told him to seek Social Security benefits.

With regard to his daily activities, Kennaway stated he can drive, but not for long distances. He helps his girlfriend care for their two children, and the couple shares in cooking, shopping, laundry, and other household duties.

## 2. *Review of Kennaway's medical history*

Kennaway saw Nathaniel A. Meyer, M.D. on March 15, 2002, complaining of back pain and fatigue, as well as ongoing foot problems for a couple of years. The doctor diagnosed marked hammer toe-type deformity with flexor tendon foreshortening causing hammer toes bilaterally. X-rays of Kennaway's back were normal, and the doctor opined Kennaway's back pain could be due to the significant deformities of his feet. Kennaway continued to complain of back pain at intermittent follow-up visits over the summer. On September 9, 2002, he returned to see Dr. Meyer complaining of greatly increased back pain for about two weeks, exacerbated by riding a knee board. He had some numbness in both legs but no weakness. His left leg hurt worse than his right. Dr. Meyer administered an injection of a nonsteroidal anti-inflammatory agent, and prescribed oral medications including a steroid burst, pain reliever, muscle relaxant, and a nonsteroidal anti-inflammatory agent.

Kennaway returned for followup on September 12, 2002, stating his back was no better and he continued to have significant pain, as well as weakness of both legs and difficulty urinating. Kennaway was scheduled for an epidural flood

Kennaway saw Dr. Puumala on September 17, 2002, for evaluation of lumbar radiculopathy. Kennaway gave a history of on-and-off back problems for many years. He stated he had begun to suffer increased back pain at the end of August, without any particular inciting event, and he also was having trouble with his left leg. He then went knee-boarding which exacerbated the situation, causing pain and numbness in both of his legs. He was treated with oral steroids and an epidural injection which provided some relief, especially with his left leg, but he still had problems with his right leg. He described pain in his low back, radiating down the posterior aspect of his thigh and calf; numbness in his calf, knee, and into his foot, including into the tips of his toes; continued occasional numbness in his left leg; generalized weakness of the right leg; and a stiff/numb

feeling around his elbows occasionally. He stated his symptoms worsened with activity, especially walking, and lying down provided some relief. Kennaway stated his grandfather had "very high arches," and Kennaway's father also had problems with his feet.

Dr. Puumala noted Kennaway's gait was abnormal and his left ankle was turned in. He could walk on his toes but not his heels. He exhibited giveaway-type weakness and possibly "true weakness" in his lower extremities, and altered sensation to pinprick and touch. He had somewhat reduced deep tendon reflexes in his lower extremities. The doctor observed that Kennaway had very high arches in both feet and flexion deformities of his toes. Straight-leg-raising was positive at 90 degrees bilaterally, worse on the right than the left. An MRI of Kennaway's lumbar spine from September 9, 2002, revealed disc space narrowing and desiccation of the disc at L5-S1, and disc extrusion centrally and to the right, displacing the S1 nerve root. The doctor diagnosed Kennaway with "an S1 radiculopathy on the right on the basis of an extruded disc at L5 S1 accentric to the right," and "a sensorimotor polyneuropathy," which the doctor opined could be "something like Charcot Marie-Tooth syndrome." Due to the size of the disc extrusion and Kennaway's polyneuropathies, he recommended surgery to remove the extruded disc.

On September 18, 2002, Kennaway saw Philip A. Deffer, Jr., M.D. for evaluation of bilateral foot deformities and low back pain. The doctor noted Kennaway had been referred to him previously for evaluation of cavovarus deformity of his feet, but Kennaway had missed a few appointments and had herniated a disc in his low back in the interim. Dr. Deffer agreed with Dr. Puumala's recommendation of surgery for Kennaway's back. With regard to Kennaway's feet, Dr. Deffer noted CMT was the most likely diagnosis. Kennaway had a fixed deformity of his great toe with flexion deformity at the IP joint; similar deformity of the second toe; and very high arches, with classic cavovarus deformity of his feet, left worse than right. Kennaway was scheduled for nerve conduction studies

to confirm the CMT diagnosis. The doctor planned to wait until after Kennaway's back surgery to determine what treatment would be appropriate for his feet.

On September 27, 2002, Kennaway underwent a right L5 partial hemilaminectomy, removal of extruded disk, and foraminotomy over the right S1 nerve root. He tolerated the surgery well and exhibited no new neurological deficits. The surgery relieved his radicular pain, although he had some muscle spasms. He was dismissed from the hospital the day following surgery with prescriptions for a muscle relaxer, a pain medication, and a nonsteroidal anti-inflammatory. He was directed not to drive for two weeks. Kennaway saw Dr. Meyer the next day complaining of increased pain, including light pain down his legs. The doctor gave him an injection for pain, and prescribed a muscle relaxer and a pain medication. He directed Kennaway to follow up the next day; however, Kennaway called and stated he was feeling better and did not want to come in for follow-up unless he got worse.

Kennaway returned to see Dr. Meyer on October 17, 2002, complaining of increasing low back pain for two days. He stated he had been quite a bit more active. He received an injection of anti-inflammatory agent and pain reliever, and was directed to follow up in two days if his symptoms were not resolving. Kennaway returned for follow-up on October 23, 2002, stating he was doing 50% to 75% better and he had no new complaints. He was seen again on October 30, 2002, with complaints of continued back pain, but still improving. He was released to return to work for about two hours per day, three days per week. At his next visit on November 13, 2002, Kennaway stated his back pain was slightly worse. He was directed to take Ibuprofen and Ultracette. Kennaway noted he was scheduled to see Dr. Puumala for follow-up the next day.

When Kennaway new saw Dr. Puumala, he reported his radicular pain was gone, but he still had a lot ot trouble with back pain and pain down both legs. He also reported some numbness in his arms bilaterally, and myoclonic jerks at night. He was taking

Diazepam for muscle spasms. Kennaway was released to return to work for up to six hours daily.

Kennaway returned to see Dr. Meyer on November 22, 2002. He complained of continued pain in his back and muscle spasms in his right leg. The doctor prescribed a muscle relaxer, and referred Kennaway to a physical therapist.

Kennaway saw a physical therapist for initial evaluation on November 25, 2002. Kennaway reported he could not stand and work at his job for more than four to six hours because of increased back and leg pain and jumpiness. He stated he had a dull ache all day long with some shooting-type impulses going down his leg. He expressed a desire to return to full-time work and set goals of being able to stand without limits, and have unlimited ranges of motion and forward bending. Upon examination, Kennaway exhibited no significant limitations in his range of motion, although he did complain of back pain with full flexion and extension. He was tender over his spinal incision area, but there was no redness or swelling. Kennaway was started on a home program consisting of exercises and stretching, and avoidance of flexion activities. Kennaway called to cancel his next physical therapy appointment on November 27, 2002.

Kennaway saw Dr. Meyer on November 29, 2002, complaining of worsening back pain for three days. He had helped his girlfriend move, which he stated could have exacerbated the problem. He was directed to decrease his activity somewhat, and continue on his current medications. He saw the doctor again on December 4, 2002, complaining of continued back pain, radiating down his right leg. He was given an injection and a repeat MRI was scheduled.

Kennaway had a repeat MRI of his lumbar spine on December 5, 2002. The study showed moderate degenerative disc changes at L5-S1, with a moderate diffuse posterior disc bulge/protrusion present, but without evidence of impingement of either L5 nerve root and no significant central spinal stenosis; and scarring from his surgery around the right

S1 nerve root. Kennaway saw Dr. Meyer again on December 6, 2002, and reported that he was doing well. His pain level was about the same, but he had no new complaints or problems. He was continued on his current medications. Kennaway received another injection for back pain on December 12, 2002. The same day, he saw Dr. Puumala for follow-up of his back. He reported his radicular back pain was gone, but his bilateral leg symptoms had returned. He complained of back pain and stiffness, especially in the morning. He noted he had been trying to work, but had only been able to work every other day. He had received intramuscular injections when his pain worsened. He noted most of his pain problem was at night. A repeat MRI showed a small disc protrusion that did not seem to compress any nerves, and some significant scarring. Dr. Puumala released Kennaway to perform activities he felt up to doing as long as he avoided bending and twisting or lifting over twenty pounds. He recommended Kennaway maintain his current work activities, given his continued nerve difficulties. He prescribed pain medications and scheduled Kennaway for an epidural flood, which was administered on December 18, 2002.

The next day, Kennaway reported to Dr. Meyer that his pain was worse, and the epidural had seemed to cause more tenderness. He received an injection for pain. Kennaway returned to see Dr. Meyer on December 26, 2002, complaining of continued back pain, radiating down his left leg. Dr. Meyer noted he and Kennaway "did discuss [the] situation including the fact that he does have another herniation." Dr. Meyer and Dr. Puumala had conferred and agreed Kennaway should finish his course of epidural floods before evaluating further treatment options. Kennaway was directed to stay off work. Kennaway received another injection for pain on December 30, 2002, and he was scheduled for an epidural flood.

On December 30, 2002, J.D. Wilson, M.D. reviewed the record, noted Kennaway's reported symptoms, and completed a Physical Residual Functional Capacity Assessment

form.  Dr. Wilson found Kennaway should be able to lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for at least two hours in an eight-hour workday; sit, with normal breaks, for about six hours in an eight-hour workday; and push/pull without limitations.  He found Kennaway to have no other functional limitations.  He noted no treating or examining source statements had been reviewed in reaching his opinions.

Dr. Meyer saw Kennaway on January 7, 2003.  Kennaway reported significant back pain radiating into his legs bilaterally.  Dr. Meyer administered an injection, and suggested Kennaway be evaluated by a neurologist.  Kennaway saw Dr. Meyer again on January 13, 2003.  The doctor planned to continue monitoring Kennaway's back pain. He noted Kennaway was scheduled to see a neurologist in two months for evaluation of his CMT and ongoing back pain.

When Kennaway next saw Dr. Meyer, on January 17, 2003, he stated he was doing quite well.  He was taking Valium, which was helping his pain.  The doctor completed work waiver forms for Kennaway.  At his next appointment, on February 10, 2003, Kennaway requested a release for work.  He continued to have back pain and was scheduled for a consultation at the University of Iowa.  Dr. Meyer started Kennaway on Neurontin and also prescribed Percocet for pain.

Kennaway saw Dr. Meyer on February 24, 2003, complaining of back pain for three days, weakness, left foot pain, and trouble sleeping at night.  He noted he had had facial surgery.  He was given an injection for his back pain, and the doctor prescribed an antibiotic for the facial pain.

Kennaway received another injection for pain on March 4, 2003.  He called later in the day to report the shot had no effect, he was unable to relax, and his pain was unbearable.  He received another injection.  He saw Dr. Meyer for recheck the next day, and noted he was going to Iowa City the same day for evaluation.  He received another injection for pain.

Kennaway next saw Dr. Meyer on March 7, 2003. Kennaway reported he was doing well and Bextra was helping his pain. He returned on March 14, 2003, and received a pain injection and refilled prescriptions for Valium, Flexeril, and Dilaudid. Kennaway saw the doctor again on March 26, 2003, and stated he was doing well and his pain was somewhat better. He was continued on his current medications. At his next appointment on April 3, 2003, Kennaway reported continued, intense back pain. Dr. Meyer urged him to see a pain management specialist, and an appointment was scheduled for Kennaway.

On April 3, 2003, Kennaway was evaluated by orthopaedic surgeon Annunziato Amendola, M.D. at the University of Iowa, in connection with his bilateral foot problems. Kennaway reported increasing problems with weight-bearing and ambulation because of a worsening deformity of his left foot. He complained of severe pain in his feet, exacerbated by walking, with or without shoes, and worsening throughout the day. He stated he had difficulty walking indoors or out, climbing stairs, and doing even moderate physical work. Examination revealed calf wasting bilaterally, worse on the left; peroneal weakness bilaterally; a very high arch with clawing of the toes on the left and less so on the right; some fixed heel varus on the left; fixed high arch and clawing of toes on both feet, worse on the left. The doctor opined Kennaway's heel varus was not correctable completely, and he opined the deformity on the right was completely correctable. The doctor prescribed orthotics and good shoes with shock absorption to allow Kennaway to work, and he scheduled corrective surgery for Kennaway's left foot.

Kennaway saw Dr. Meyer on April 15, 2003, to obtain refills of his medications. He saw Dr. Meyer again on April 25, 2003, complaining of continued pain in his back and legs. He stated he was picking up his orthotic shoes in about a week. He was continued on Percocet and Flexeril. His prescriptions were refilled on May 20, 2003. Kennaway saw the doctor on May 30, 2003, complaining of continued back pain. He was given an injection for pain.

On May 30, 2003, the Mercy Pain Clinic called Dr. Meyer's office to report that Kennaway had failed to show for his appointment that was scheduled for the previous day.

Kennaway underwent extensive surgery on his left foot on June 18, 2003. He did well following the surgery, wearing a left below-the-knee cast. Kennaway saw Dr. Meyer for post-surgical check on June 20, 2003. He stated he was doing quite well and had only moderate pain. By July 2, 2003, Kennaway's cast had become tight and was rubbing the back of his knee. Another doctor in Dr. Meyer's office split the cast slightly to make it more comfortable for Kennaway.

Notes indicate Kennaway's prescriptions for pain medications and muscle relaxers were refilled regularly throughout 2003.

At a post-surgical exam in Iowa City on August 4, 2003, Kennaway noted the pins in his 2nd distal phalanx had fallen out several days earlier. He complained of continuing pain, but stated he was taking Percocet two to three times daily with good effect and his pain was improving. The doctor noted Kennaway appeared to be healing well, without complications. His cast was removed and Kennaway was placed in a walking boot with no weight bearing for one month, after which he would be referred to physical therapy.

On August 5, 2003, Kennaway was evaluated for his CMT disease by neurologist James B. Worrell, M.D. at the University of Iowa. Kennaway complained of ongoing low back and right leg pain. Upon examination, Kennaway exhibited good strength in his upper extremities and legs. He had loss of vibration, and loss of pin and touch sensation below the knee, worse on his right leg. He had a boot on his left foot and walked with crutches.

When Kennaway next saw Dr. Meyer, on August 19, 2003, he stated he still was having back pain, but his left leg was much improved since his recent surgery. He was referred to the spine center in Iowa City for evaluation of his back pain. Dr. Meyer

encouraged Kennaway to have his right leg surgically treated, which the doctor believed could alleviate a lot of Kennaway's back pain.

Kennaway returned to Iowa City for post-surgical follow-up on September 8, 2003. He stated he had been doing well until the previous weekend when he was walking barefoot in his house and stubbed his toe. His toe had been significantly bent since the incident. The doctor noted a deformity at the IP joint of Kennaway's great toe in flexion and abduction. The doctor gave Kennaway a digital block and manipulated his great toe into the correct posture. He noted that on weight bearing, the toe was in alignment and did not plantar flex excessively while Kennaway was walking. The doctor prescribed physiotherapy for ankle range of motion, with directions that the physiotherapists avoid manipulating Kennaway's great toe. He prescribed Percocet, and directed Kennaway to keep his foot elevated with ice on the drive home.

Kennaway saw Dr. Meyer on September 26, 2003, for recheck of his left foot incision. He was concerned about some swelling along the arch of his left foot since surgery. The doctor reassured Kennaway that the swelling was nothing serious, and directed him to watch for signs of infection such as discoloration or worsening pain.

On September 26, 2003, Claude H. Koons, M.D. reviewed the record and prepared a Physical Residual Functional Capacity Assessment form in which he opined Kennaway could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push/pull without limitation. Dr. Koons noted his suggested restrictions on Kennaway's functional abilities were applicable for the period prior to Kennaway's foot surgery, and for a period twelve months thereafter. He noted no treating or examining source statements had been reviewed in reaching his opinions.

Kennaway saw Dr. Meyer on October 10, 2003, complaining of neck pain for approximately two weeks, radiating down into his arms upon movement of his neck. The doctor ordered an MRI.

Kennaway saw Ernest M. Found, Jr., M.D. at the University of Iowa on October 30, 2003, for further evaluation of ongoing back and neck pain. He reported intermittent pain in his arms and left leg, and continuous pain in his back and right leg, with frequent weakness, numbness, and tingling in his right leg. He stated his back hurt much worse and was more bothersome to him than his leg pain. He stated he could not walk, sit, or stand for more than ten minutes at a time, and pain always interrupted his sleep. He also reported moderate difficulty staggering when he walked. With regard to his arms and hands, he reported moderate difficulty opening a jar and tying his shoes, but no difficulty writing, turning a key, buttoning buttons, or using a fork and knife to cut food. Examination revealed healing surgical scars on his left foot; limited ankle motion on the left, but unlimited on the right; no knee or hip pain with motion; and diminished sensation on the left foot and leg. The doctor noted Kennaway's symptoms were identical to those he had reported in December 2002. He further noted Kennaway had a degenerative disc at L5-S1 that is evident on plain x-rays, but no spondylolisthesis. Upon review of a repeat MRI, doctors felt there was no disc herniation or other lesion amenable to further back surgery. They opined Kennaway's symptoms likely were related to residual nerve root damage or irritation from his original disc herniation, and in addition, his CMT disease could make his nerves more sensitive to damage. They recommended evaluation through a rehab program so Kennaway could learn what he can do and should not do to relieve his pain. Kennaway was enthusiastic about the approach and he was scheduled for a rehab appointment.

Kennaway returned to see Dr. Meyer on November 10, 2003, complaining of pain in his cervical and lumbar spine areas. According to Kennaway, doctors in Iowa City had

opined his pain was due either to scarring of the nerves or simple nerve damage. He requested a second opinion and was referred to neurologist G. Barrie Purves, M.D. Kennaway saw Dr. Purves on January 8, 2004, for evaluation of his back and leg pain. Kennaway reported some progression of his CMT disease into his hands, but his major complaint was his back and leg pain, which he stated precluded him from doing any meaningful activity or work. He also reported some insomnia, constant headaches, joint and muscle pains, and some numbness and tingling in his hands. Dr. Purves noted that throughout the examination, Kennaway was "extremely active, moving around the room, agitated and twisting his torso and back almost constantly and he just seems to be unable to even sit still." Kennaway reported that before his knee-boarding injury, he had been healthy and very active. He stated he drank two to four beers per month, and he smoked marijuana which helped relieve his pain. He denied using other medications besides aspirin or Tylenol. Upon examination, Dr. Purves observed Kennaway had good range of motion except for some limitation of forward flexion of his lumbar spine. He noted obvious wasting distally in both of Kennaway's legs with very high arches and claw toes, but no wasting or demonstrable weakness in his upper extremities. Dr. Purves reviewed Kennaway's last MRI and opined there was nothing surgically that could be done for Kennaway, although he did order a repeat MRI to rule out further disc problems at L5-S1.

On June 4, 2004, Kennaway saw Dr. Meyer requesting a disability examination and completion of insurance paperwork. Dr. Meyer stated he could not perform a disability examination, and he advised Kennaway to check with his disability insurance company to see how they needed to have the exam handled.

On July 8, 2004, Kennaway's girlfriend called Dr. Meyer's office reporting that Kennaway was having significant back pain. She asked to schedule an appointment, but Dr. Meyer had no openings for two to three weeks. Kennaway was scheduled to see the

doctor on August 16, 2004, but when he arrived, the doctor was tied up at the hospital. Kennaway chose to reschedule rather than wait.

On August 16, 2004, Kennaway saw Dr. Amendola for evaluation of "symptomatic nonunion of the IP joint of the hallux and of the DIP joint of the 2nd toe" on his left foot. He was given a prescription for orthotics and was scheduled for further surgery on his left foot.

Kennaway saw Dr. Meyer on August 20, 2004, complaining of continued back pain, occasionally radiating down both of his legs. He had no weakness or tingling. His prescriptions were refilled and he was directed to follow up in Iowa City in two weeks.

On October 5, 2004, Dr. Meyer's office referred Kennaway to the Iowa City pain clinic. The next day, Kennaway was seen in Iowa City for revision arthrodesis of the joints of his left great and 2nd toes. Dr. Amendola performed fusion of the great toe interphalangeal joint and of the second toe distal interphalangeal joint. Kennaway was released on crutches with directions not to work until further evaluation and release. Doctors advised Kennaway that he was at risk for nonunion given his smoking history (he reported smoking half a pack a day), and they counseled him to quit smoking. Kennaway was released from the hospital on crutches with full weight bearing on the right and only touch weight bearing on the left.

On October 8, 2004, Kennaway's girlfriend called Dr. Meyer's office to report that Kennaway had been given a prescription for Percocet following his foot surgery the previous week, but it was not helping him. Dr. Meyer's office prescribed a morphine patch. On October 11, 2004, Kennaway was seen in Dr. Meyer's office to have his foot dressing changed.

Dr. Meyer saw Kennaway on November 10, 2004, for follow-up of his foot. Kennaway complained of quite a bit of pain and also problems sleeping. Dr. Meyer prescribed Skelaxin and Ambien.

On January 4, 2005, Kennaway underwent a functional capacity evaluation by occupational therapist Dave Noeldner, OTR/L, at Buena Vista Regional Medical Center. Kennaway completed a number of forms describing his current symptoms and limitations in connection with the evaluation. He indicated his pain intensity was severe without much variance. He reported that he had changed the ways in which he washes and dresses because of increased pain; he can lift only very light weights, at most; pain prevents him from walking over than one-quarter mile; pain prevents him from sitting for more than ten minutes at a time; he is unable to stand for longer than one-half hour without increasing pain; pain prevents him from sleeping "at all"; he has little social life because of pain; his pain increases with travel; and his pain is worsening gradually.

Based on the test results, Mr. Noeldner found Kennaway could do work at the light physical demand level for activity above the waist, and the medium light physical demand level for activity below the waist. He noted Kennaway's grip strength was significantly decreased and well below normal on the right, and also decreased, though not as markedly, on the left. He also exhibited deficits in his pinch strength, with right worse than left. Kennaway fell well below the normative population averages for occupational work areas involving manual dexterity. He was noted to drop pegs occasionally during the dexterity testing, which the evaluator found corroborated Kennaway's report of loss of sensation in his hands. Mr. Noeldner opined Kennaway "would have difficulty working in any fine coordination work such as in a factory with repetitive hand use due to the diminished sensation in both hands."

Kennaway exhibited the ability to sit, stand, kneel, work above shoulder, and crawl for thirty feet, occasionally (i.e., per the evaluation criteria, 0% to 33% of the workday), and he was able to use postural shifting effectively during the test to meet time requirements. Mr. Noeldner noted Kennaway displayed symptoms of pain at appropriate times during testing, but his pain did not interfere with his performance on the tests.

### 3. *Vocational expert's testimony*

The ALJ asked the VE to consider an individual of younger age with a high school equivalency education, Kennaway's work history, and medically-determinable impairments that would cause the work-related limitations described by Kennaway. The VE stated this individual would be unable to perform any work on a full-time basis. He further stated if Kennaway's testimony were considered fully credible, then Kennaway would not be able to work more than a half day.

The ALJ then asked the VE to consider the same individual with the following limitations, which are based on the state agency's functional capacity assessment:

> What if you assume a person could occasionally lift and carry 20 pounds, frequently 10 pounds; could stand and/or walk with normal breaks for at least two hours of an eight-hour workday, sitting with normal breaks for about six hours of an eight-hour workday; push/pull is unlimited; postural activities, they would have no climbing of ladders, ropes, or scaffolds; otherwise postural activities could be done occasionally. There's no manipulative limits, no visual, communicative, or environmental limits.

The VE stated the described limitations generally would restrict the individual to seated, light, sedentary work, and there would be no reduction in the individual's ability to do the full range of sedentary work. The individual also could do some light work. However, the individual could not perform any of Kennaway's past jobs. The VE opined the individual could perform jobs at the light level where he could alternate sitting and standing as needed. He gave examples of assembler of small products, inspector and hand packager, and electronics worker, all of which jobs exist in sufficient numbers in the local and national economies.

The VE then reviewed the functional capacity assessment performed by physical therapist Noeldner on January 4, 2005. With those limitations, the VE stated the individual would be unable to perform any of Kennaway's past work. He opined the

individual still could perform the full range of sedentary and unskilled light work if he was free to alternate sitting and standing at will, and the same exemplary jobs would be appropriate for the individual.

The ALJ then added to the hypothetical the limitation that the individual could not use his hands for fine manipulation, but he could do gross reaching and handling. The VE stated "fine finger manipulation directly relates to sedentary work, and . . . sedentary work would be in jeopardy under this hypothetical." However, he opined unskilled light work, where the individual could alternate sitting and standing, would be tolerated with the reduced limitations in handling. The VE acknowledged that the evaluator had rated Kennaway's ability to use his hands as quite low. The VE stated Kennaway's test scores on pegboard testing would call into question his ability to perform at an acceptable production standard. However, he also noted this type of testing can be somewhat ambiguous, and may vary depending on the criteria required in a particular industry. Overall, however, the evaluator found Kennaway's coordination to be severely lacking, which would affect his ability to perform any type of assembly work.

### 4. *The ALJ's decision*

The ALJ found that although Kennaway had worked for awhile after his alleged disability onset date, the work was not at the substantial gainful activity level, and Kennaway has performed no substantial gainful activity since his alleged onset date. He found Kennaway to have "severe" impairments consisting of "Charcot-Marie-Tooth disease manifested by neuropathy of the lower extremities with classic cavovarus bilateral foot deformity, left worse than right, status post left foot reconstruction on June 18, 2003, with subsequent removal of hardware and revision of the IP joint fusion of the left great toe and distal IP joint fusion of the left second toe on October 6, 2004 . . .[; and] status post right L5 partial laminectomy, discectomy, and foraminotomy over the S1 nerve root

on September 27, 2002." However, he found these impairments, singly or in combination, do not reach Listing level of severity.

The ALJ specifically found Kennaway "has a significant financial incentive to portray himself as 'disabled' within the meaning of the Social Security Act in order to receive continuing payments should his private plan payment end." The ALJ noted Kennaway's private disability payments of over $10,000 per year exceed his annual gross earnings from employment in all years other than 1995 and 2002.

The ALJ found Kennaway's testimony to be "exaggerated and not fully credible" with regard to his alleged limitations. He determined Kennaway retains the following residual functional capacity:

> [T]he undersigned expresses agreement with the state agency physician that the claimant experiences no significant manipulative difficulties related to any underlying medical impairment. . . . The undersigned rejects the opinion of the physical capacity evaluator that the claimant's hand functioning ability is limited by reason of a medical condition, said opinion beyond the evaluator's expertise. Thus, in sum, the undersigned finds the claimant retains the following functional capacity: to perform work requiring lifting up to 20 pounds occasionally and 10 pounds frequently; to stand and/or walk for at least two hours in an eight-hour workday, but not for at least six hours in an eight-hour workday, with the opportunity to sit as desired; to sit about six hours in an eight-hour workday with normal breaks; to never climb ladders, ropes, and scaffolds; and to perform various postural activities on no more than an occasional basis.

Based on this residual functional capacity, the ALJ found Kennaway could not return to his past relevant work, but he could perform a significant range of light work, although not the full range of light work. He determined Kennaway could make the vocational adjustment to other work at the light exertional level such as small products assembler, or inspector and hand packager, and at the sedentary exertional level such as

electronics worker, all of which jobs exist in significant numbers in the local and national economies.  The ALJ therefore concluded Kennaway is not disabled.

### III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon*, 353

F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC,

but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Kennaway argues the ALJ "largely ignored the effects of [his] polyneuropathies." He notes Dr. Puumala restricted him to lifting no more than twenty pounds with no bending or twisting "well before it became apparent that multiple surgeries were going to be necessary on [Kennaway's] lower extremities." He also argues his treatment at the University of Iowa has continued past the time evidenced by the administrative record. He points out that he still needs surgery on his right foot, and by the time of the ALJ

hearing, his left foot had not healed sufficiently for him to undergo surgery on his right foot.

Kennaway points to his evaluation on October 30, 2003, at the University of Iowa as evidence that he is unable to work. He characterizes the report from that evaluation as setting forth functional limitations that were found by the doctors. *See* Plaintiff's brief at pp. 4-5 (quoting R. at 284-85). Rather, what the plaintiff has quoted in his brief is the doctors' recitation of Kennaway's subjective complaints regarding his limitations, as set forth in the "Patient Entered History" section of the report. On physical examination and review of the December 2002 MRI, the doctors explained to Kennaway that there was no disc herniation or other lesion amenable to further surgery, and his symptoms likely were related to residual nerve root damage or irritation from his original disc herniation. They recommended he enter a rehab program to help him learn what he can, and cannot, do. Kennaway argues the ALJ's residual functional capacity determination is "clearly contrary" to these doctors' findings regarding his functional abilities, as well as contrary to the results of the evaluation completed on January 4, 2005, by the occupational therapist. The record does not support this argument.

The record indicates Kennaway suffered a back injury in early September 2002, that disabled him for a period of several weeks. He then was able to return to work, although he felt he could not work full time. The evidence of record indicates Kennaway would have been able to perform other work that existed in the local and national economies even if he no longer could work at his job at Hy-Line.

Then in the summer of 2003, Kennaway began undergoing treatment for his CMT, including surgery on his foot. He had some difficulties ambulating and healing well from surgery, but the record contains no evidence that his foot and leg difficulties or other symptoms from his CMT would have prevented him from performing all types of substantial gainful activity. The court agrees with the ALJ's assessment that given the

amounts of disability insurance benefits Kennaway has been receiving, it has been in his own best interest not to return to work full time.

Although the court does not doubt Kennaway suffers pain from his back injury and CMT disease, and recognizes his condition may continue to deteriorate to the point where he becomes disabled, the record contains substantial evidence to support the ALJ's conclusion that at the time of his decision, Kennaway retained the residual functional capacity to work, and he therefore was not disabled.


## V. CONCLUSION

Accordingly, for the reasons discussed above, the Commissioner's decision is **affirmed**, and judgment will be entered in favor of the Commissioner and against Kennaway.

**IT IS SO ORDERED.**

**DATED** this 2nd day of May, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT